**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOHN PATRICK EDWARDS,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **v.** | ) | **Judge Sharp/Knowles** |
| | ) | **Case No. 3:14-cv-01256** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

### I. Introduction and Background

Movant began this action by filing a pro se Motion to Vacate, Set Aside, or Correct

Sentence pursuant to 28 U.S.C. § 2255.  Docket No. 1.  Movant was subsequently appointed

counsel (Docket No. 3), who filed an Amended Motion under § 2255.  Docket No. 14.  Movant

thereafter filed a Motion for an Evidentiary Hearing.  Docket No. 18.  The case was then referred

to the undersigned for "further proceedings under Rule 8(b), Habeas Corpus Rules, 28 U.S.C. §

636(b)(1)(B), and Rule 72.03, Local Rules of Court."  Docket No. 21.  The undersigned granted

the Motion for an Evidentiary Hearing.  Docket No. 22.  An evidentiary hearing was held

September 23, 2015, September 24, 2015, and September 28, 2015.  Movant and Respondent

both filed post-hearing briefs.  Docket Nos. 37, 42.

On February 3, 2012, Movant pled guilty before the Honorable William J. Haynes, Jr., to

one count of obstruction of justice.  Movant was charged with obstructing justice because he

attempted to sell information gathered during a federal wiretap investigation of a large-scale

drug trafficking conspiracy to targets of that investigation.  Prior to being charged, Movant had

worked as a police officer for over fifteen years. More specifically, he had worked as a narcotics detective for many years and had worked as a task force officer ("TFO") for the Federal Bureau of Investigation ("FBI") in the year prior to his arrest. As an FBI TFO, he worked on federal drug trafficking investigations, including the one that led to his indictment in the underlying criminal case.

Movant knew at the time that some of the conspirators included members of a Mexican drug cartel. Movant tried to sell information including the identity of a confidential informant for the FBI who had been cooperating against members of the conspiracy. The information also included the names of the lead DEA agent and the lead FBI agent on the investigation. The FBI was able to obtain recordings of Movant and his co-conspirator discussing the scheme.

Judge Haynes subsequently sentenced Movant to serve 220 months. There is no question that the sentence was a significant increase over the sentencing guidelines range. An understanding of the negotiations that led to the plea entered by Edwards will be helpful to an understanding of the issues raised herein.

At some point in the criminal proceedings, the government made an offer for a plea agreement. The proposal was that Edwards would plead guilty to the single count of obstruction of justice, receive a ten year sentence, and plead guilty to drug charges that were being considered in the Eastern District of Tennessee. His attorneys encouraged him to take that offer, but he ultimately declined to do so and decided to enter an "open" plea before Judge Haynes. Although Edwards essentially claims that he was misled by his attorneys and that he did not understand that he could be sentenced to a maximum of twenty years in prison, testimony establishes that his attorneys discussed these matters with him on a number of occasions.

Edwards ultimately made the decision to plead open to the charge because he believed that Judge Haynes would sentence him to only approximately 10 years.

Movant appealed to the Sixth Circuit, but that Court upheld the sentence in a three page per curiam order. *See United States v. Edwards*, Case No. 12-5548, United States Court of Appeals for the Sixth Circuit.

## II. Ineffective Assistance of Counsel

The Sixth Amendment provides that a criminal defendant is entitled to effective assistance of counsel. *McMann v. Richardson*, 379 U.S. 759, 771 (1970). To establish a violation of this right, the Movant bears the burden of showing that his attorney's performance was in some way deficient and that the defense was prejudiced as a result of the alleged deficiency. *Strickland v. Washington*, 466 U.S. 688 (1984). Within the context of a guilty plea, prejudice is shown when there is a reasonable probability that, but for counsel's error, the Movant would not have pled guilty, and would have, instead, insisted upon going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). When considering such a claim, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003).

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel during their criminal proceedings, including during the plea-bargaining process. *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012); *Titlow v. Burt*, 680 F.3d 577, 588 (6th Cir. 2012). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id.* at 686.

In *Strickland*, the Supreme Court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential," and must avoid the "second-guess[ing of] counsel's assistance . . . , [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

Moreover, in evaluating the prejudice prong, courts must be mindful that '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* (citation omitted). Rather, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### III. Evidentiary Hearing Testimony[1]

As a preliminary matter, the Court determines that Mr. Edwards simply was not a credible witness. The Court had the opportunity to closely observe the witnesses who testified at

---

[1]The transcript of the evidentiary hearing was filed as Docket Nos. 30, 31, and 32. References herein to the page numbers of these three docket entries will be to the page numbers assigned by the court reporter, not to the page numbers as the documents were filed in the Court's electronic filing system.

the evidentiary hearing: Edwards, and his attorneys Frank Lannom, Jack Lowery, Sr., and Jack Lowery, Jr. Edwards was not credible, but the attorneys were. At the evidentiary hearing, Edwards was significantly impeached by counsel for the government, as will be discussed in greater detail below. Moreover, there were significant inconsistencies between statements that were made in a pre-plea recording and testimony Edwards gave at the evidentiary hearing. For example, he testified that at the time of the plea, he "was under the impression that they couldn't go over ninety-something months and that that's what the plea was for." Docket No. 30, p. 24. Edwards thinks Lannom told him that the maximum he could get was ninety months. *Id.* at 90-91. He thinks that occurred the day of the plea. *Id.* at 91. Edwards, however, had met with Lowery, Jr. and Lowery, Sr. on the day of the plea hearing, shortly before it occurred. That meeting, or part of it, was taped, and the parties submitted an Agreed Transcript of the tape. Docket No. 33-1. The taped transcript of the conversation shows that Edwards was advised no fewer than three times that the maximum term to which he could be sentenced was twenty years. Docket No. 33-1, p. 26, 27, 29.

He further testified that, had he known a little better about the sentencing guidelines and what was at risk and had he received the actual plea agreement that the government had sent to his attorneys under 11(c)(1)(C) to ten years he would have "done different." Docket No. 30, p. 63. He states that he would have accepted the plea offer of ten years. *Id.* at 64.

At some point "Mr. Lowery" told Edwards that the United States had made him an offer for a plea agreement. *Id.* at 83. That proposal was "ten years, and plead guilty to [drug] charges out of the Eastern District of Tennessee." *Id.* at 83. He understood subsequently that the offer was a "Rule 11(c)(1)(C) agreement." *Id.* at 84. Lannom referred to it as the "C" plea,

referencing Federal Rule 11(c)(1)(C) of the Federal Rules of Civil Procedure.[2]  Docket No. 30, p.

183.  Lannom's understanding was that such a plea agreement would be "one of the few pleas

that is available where it is a set sentence if accepted by the court, and it's not subject to relevant

sentencing conduct and all the other uncertainties of the federal sentencing guidelines."  *Id.* at

183.  Counsel told Edwards that the government's position would be that the underlying

conspiracy involved fifty or more kilos of cocaine.  *Id.* at 87.  He understood that that was

associated with a particular guideline level.  *Id.*  They also told him that the government had

included a provision that would increase his guideline range based upon an abuse of position of

trust.  *Id.*  They discussed the fact that if Judge Haynes accepted the plea offer as proposed by

the government, his sentence would be ten years.  *Id.* at 88.

Judge Haynes also advised him at the plea hearing that the maximum penalty was up to

twenty years.  *Id.* at 130.  Edwards was under the impression that the maximum penalty "for any

obstruction case was twenty years," but he did not understand that the maximum penalty for *his*

case was twenty years.  *Id.*  His attorneys also told him, on the day of the plea, that if he did not

take the ten year deal that the United States had offered, the government would seek to have his

sentence be as high as possible.[3]  *Id.* at 98.

During the pre-plea conversation, Jack Lowery, Sr. told Edwards that he thought

Edwards should take the plea offer for ten years.  *Id.* at 102.  Edwards told Lowery, however,

---

[2]The Court believes that this is a typographical error and that the Transcript should have referred to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  There is no Rule 11(c)(1)(C) of the Federal Rules of Civil Procedure.

[3]This occurred at the pre-plea meeting that was recorded and is reflected in Docket No. 33-1.

that he thought the judge would not give him ten years. *Id.* at 102. Counsel did tell him that Judge Haynes could sentence him all the way up to twenty years. *Id.* Instead, he believed Judge Haynes would sentence him to about ten years or right below it. *Id.* at 103.

At the pre-plea meeting, Edwards told counsel that he wanted to enter an open plea, and that he was doing it of his own free will. *Id.* at 104; Docket No. 33-1, p. 17, 23.

Edwards testified at the evidentiary hearing, however, that he did not understand the difference between a defendant pleading with a plea agreement and a defendant just pleading "open" with no plea agreement. *Id.* at 119. The Court finds this testimony to be simply unbelievable, especially in view of the Agreed Transcript of the pre-plea meeting.

Edwards admits he lied under oath to Judge Haynes at the plea hearing and that he did so because his lawyer told him to say certain things. Docket No. 30, p. 133. He said at the plea hearing that he was satisfied by how Lowery and Lannom had represented him. *Id.* at 137. Edwards admitted that he accepted some of his attorneys' advice blindly.

Edwards testified that his attorneys never told him that he could stand up in front of the judge and speak on his own behalf. *Id.* at 158. At the sentencing hearing, he understood that he had a right to testify. *Id.* He immediately said, however, that he did not understand that he "had the right to address the Court and . . . basically to tell him your side of the story and why you thought you should get a lower sentence." *Id.* at 159.

Edwards gave the following testimony:

> [By Mr. Hannafan]: Did they ever tell you that you could stand up in front of the judge and speak on your own behalf?
>
> A. No, sir, they did not.
>
> Q. So you had no discussions with them about what you might say

or what maybe you shouldn't say if you were to do that?

A. No, sir.

*Id.* at 158.  Shortly thereafter, however, he testified:

Q. [by Mr. Hannafan]: I thought you said you all didn't even talk about that?

A. They told me not to get on the stand because it would interfere with the state charges.  That's what they told me, so I did not get on the stand to testify, that I would be subject to cross-examination, and it could interfere with the state charges.

*Id.* at 163.

Lannom discussed the ten-year offer with Edwards, but Edwards told him he would not take that offer.  *Id.* at 184.  During early negotiations with the government, the original offer was for a term of nine years, but without any further negotiations, that changed to ten years.  *Id.* Lannom stated, "that was very upsetting to John . . . ."  *Id.*  Additionally, Edwards was adamantly opposed to pleading guilty to two federal drug offenses which he adamantly proclaimed his innocence on.  *Id.*  Lannom discussed with Edwards the fact that, if he took the C deal, his sentence would be ten years.  *Id.* at 193.  Edwards also knew the maximum sentence was twenty years.  *Id.*  Lannom knew that both the Lowerys had had conversations with Edwards about how bad things could get for him.  He understood that the Lowerys had gone over that in "great detail" with Edwards.  *Id.*  In fact, that was the purpose of Lowery, Sr.'s taping the conversation with Edwards.  He stated the purpose was, "That John was putting himself in great danger by refusing an agreement, that the sentence could go much higher, and just for lack of a better word, it could go real wrong for him."  *Id.* at 194-95.

During his representation of Edwards, Lannom discussed the possibility that the United

States might also seek to supersede the indictment and add additional charges against him if he did not take a plea deal. The attorneys were also concerned about an indictment for the underlying drug conspiracy offense, which carried a ten year mandatory minimum. *Id.* at 195.

Lannom testified that Edwards understood he was entering an open plea. He is not aware of any of his counsel telling Edwards that there was a plea agreement with the United States. Docket No. 31, p. 204. Edwards understood that "it was just going to be left up to the judge as to what his sentence would be . . . ." *Id.* Lannom thought that Edwards understood that the guidelines were just guidelines. *Id.* at 204-05.

Lowery, Sr. testified that he met with Edwards just prior to the plea hearing and advised him regarding his opinions. *Id.* at 287. He stated:

> And I had a chance to talk to him directly about that, and I did express probably in some graphic terms what I thought was going to happen in view of some of these things and that he had been offered an opportunity that I thought he ought to seriously consider.
>
> You don't ever tell anybody take this, but I have gone far enough to say I think you ought to seriously consider what's being offered on this table because, you know, I would go far enough, and I think I did go far enough, to say I think you are making a mistake here. And so that's the kind of involvement I had.
>
> Q. And prior to Mr. Edwards – let me ask you this. Are you aware he entered an open guilty plea?
>
> A. Yes.
>
> Q. Prior to him doing that, had you advised him that you were concerned that the United States would seek a sentence much greater than his guidelines?
>
> A. Yes.
>
> Q. Okay. And did you advise him that it was possible that Judge

Haynes could go as high as the maximum of twenty years?

A. Yes. And the two things that I saw that was driving that upward departure was the fact that the government was contending, and I think could have proven to some degree, that his release of this information or his attempt to release this information that they were contending put the drug agents' lives in jeopardy to the extent that I read they had to move an agent and his family out of Nashville, the additional thing that there was a threat that the informant said that John had tried to get him to kill his wife.

*Id.* at 287-88.

Lowery, Sr. provided some background facts with regard to the charges against Movant

at the evidentiary hearing. He testified as follows:

Q. [by Mr. Gonzalez]: And when you reviewed the discovery, did you review from the CD-ROMs or a paper printout; what did the discovery look like that you reviewed?

A. The CD-ROMs that had been transcribed, both of these things, and then in talking – I don't remember specifically, but I knew I saw – you know I saw about the informants' statements, I saw about the drugs that were supposedly sold in East Tennessee.

I saw the discovery that mentioned the fact that he had taken drugs from the evidence room in Wilson County, two hundred fifty pounds of marijuana and two or three kilos of cocaine, and he had given to this man, and he was selling it to some cartel in East Tennessee.

We were concerned that the Knoxville people were going to bring charges also. And then we had gotten into this thing, and it came out in the discovery about he had offered Settles or Nettles, tells whatever his name is, to kill his wife, and then he wouldn't do it.

And he said can you get me some pills. All these things I was familiar with when I talked to John about what he ought to do in this case.

There were some pretty raw situations involved in the discovery that we had. That's why I say, this was a highly intense case. I

have handled a lot of cases.  This one had some bad vibes with it.

Docket No. 31, p. 301-02.

Lowery, Sr. further testified:

> Q. [by Mr. Hannfan]: All right.  And then second is you started to talk a little bit about Mr. Edwards's knowledge about the federal criminal process that he had gained as a result of working, I guess, with the FBI.
>
> And my question to you is, how has the knowledge that Mr. Edwards had gained working as a federal task force officer affected his view of the defense he wanted to present in this case?
>
> Do you understand what I'm asking?
>
> A. Yes, I think I do.  And the conversations I had with Mr. Edwards, he would express his knowledge about the guidelines. He – sometimes he would bring some documents with him in the discussions.
>
> And he seemed to feel that he had some projected knowledge of what the court might do in this case, and I was having more than normal problems trying to explain to him some of the conclusions he was reaching was not properly based within the guidelines or not based on the factual situation that was – or the alleged factual situation that we were faced with.
>
> And I think it was – I do think it was working against him.  I think it's one of these things where he had just enough knowledge for it to kind of be dangerous, and it worked against him in this case because he was very – John made some pretty – he could make a decision and stick to it.
>
> I mean it was hard to get him to change his mind sometimes, and he would come up with a conclusion that he had reached that he thought was based on what he thought was good reasoning, and it was hard to get him to change and to see the problem that was developing out there, that there was a storm coming in with this case, and I couldn't get him to see that.

Docket No. 31, p. 307-08.

Lowery, Jr. had explained to Edwards that Judge Haynes could go as high as twenty years in sentencing him. Docket No. 31, p. 339. He discussed that "numerous times" with Edwards. *Id.* Edwards ultimately rejected the Rule 11(c)(1)(C) because he believed in "the opportunity to do better than the plea at sentencing." *Id.* Edwards told Lowery, Jr. that he did not want to accept the proposed plea offer. *Id.* Edwards stated he was not comfortable with having to plead to the drug counts and that "he wanted an opportunity to argue for a lower sentence at the sentencing hearing . . . ." *Id.* at 340. Lowery, Jr. told him he did not think that was good idea. Lowery told Edwards he was concerned that the government would add additional counts if they rejected the plea agreement. *Id.* Edwards expressed to Lowery, Jr. that he understood what he was telling him. *Id.* at 340-41.

Edwards ultimately told Lowery, Jr.:

> I want the opportunity to be able to argue at sentencing for a lesser
> sentence, I think that we have – that there's a good chance that I
> can get a lesser sentence, and I don't want to cut myself off from
> being able to argue.

*Id.* at 342.

Lowery, Jr. conceded that he failed to object to the sentence that had been imposed by Judge Haynes, and that that was an error on his part. Docket No. 32, p. 388. Other than that, Lowery, Jr. believes he represented Edwards effectively and he is aware of nothing else that he or Lannom could have done to convince Judge Haynes to impose a lower sentence than the one he imposed. *Id.* at 388-89.

Finally, Edwards gave the following testimony as part of his rebuttal proof:

> Q. [by Mr. Gonzalez]: Did Mr. Lannom ever meet with you after
> your sentencing here at the federal courthouse and admit to being
> ineffective?

A. Yes.

Q. What did he say?

A. He met me here at the courthouse, and he apologized. He said he was wrong about the cross-reference.

*Q. Anything else?*

*A. No.*

*Id.* at 442 (emphasis added).

Edwards was cross-examined by government counsel, and he testified:

[By Mr. Hanafan]: Okay. That's not anywhere in any of your pleadings in this case is it?

A. I don't know. In the pleadings I wrote that he lied about – or that he was wrong about the cross-reference, that he told me that multiple times.

Q. I'm sorry. It's in your 2255 that you said Frank Lannom met with you and told you after the sentencing that he messed up, that he was wrong about the cross-reference?

*A. Absolutely. Oh, no, no, no, no.*

Q. I didn't think so.

A. I didn't understand your question. Calm down. Let me answer, sir. I'm trying to answer.

Q. Mr. Edwards I think you did answer.

Mr. Gonzalez: Your Honor, can he finish his answer?

The Court: Yes, sir. He can finish his answer.

The Witness: Okay. When I met with Mr. Lannom when I was writing up the 2255, at the same time, I met with him up here and that's when he told me, and he apologized.

He said that he'd only had two cases in his entire career that he

> ever lost, mine and another, and he apologized, and he was wrong
> with the drug weights, and that he was wrong over the cross-
> reference.

*Id.* at 443-44 (emphasis added).

In other words, Edwards initially admitted that he "absolutely" had raised in his 2255 the alleged apology from Lannom, then he denied it four times. On direct examination during rebuttal, he had just testified that Lannom apologized, said he was wrong about the cross-reference, and that there was nothing else. He then testified that there was, in fact, more that Mr. Lannom told him.

After back-pedaling, Edwards finally admitted that that alleged conversation was not mentioned in anything that Edwards's attorney had filed on his behalf. *Id.* at 447.

## IV. Issues

Movant raised eight issues in his "Brief in Support of Motion to Vacate," which was filed after the evidentiary hearing.[4] Those issues are as follows:

1. The concurrent representation by Mr. Edwards's counsel of Geoff Mason, a government cooperator against Mr. Edwards;

2. Counsel Frank Lannom failed to disclose to Mr. Edwards his lack of experience in federal criminal cases before agreeing to take the case;

3. Defense counsel failed to hire an investigator to help prepare a defense or to otherwise effectively investigate the case;

4. Defense counsel failed to draft a legally and factually accurate plea petition and instead used an outdated form petition that presented the impression to all parties and to the court that the plea was pursuant to a plea agreement with the government when, in fact, it was not;

---

[4]Movant raised other issues in his pro se Motion to Set Aside and in his Amended Motion to Set Aside. In view of the fact that Movant has not discussed those issues in his post-hearing Brief, the Court will not address them.

5.      Defense counsel failed to properly prepare for the anticipated proof to be offered by the government at sentencing and failed to move for a continuance of the hearing to allow them time to prepare;

6.      Defense counsel negligently chose to argue about the quantity of drugs to be used for sentencing purposes even though the quantity had no effect on the base offense level and, instead, opened the door for the government to introduce ancillary and prejudicial testimony;

7.      Defense counsel negligently advised Mr. Edwards to completely forego allocution for fear that his statements could be used against him in still pending state court charges instead of advising Mr. Edwards of the importance of allocution and how to couch his statements narrowly so as to not adversely affect his state court case or advising on alternative methods of allocution, such as through counsel, in writing, or in camera;

8.      Defense counsel failed to articulate objections to the court's significant upward variance or the factual bases for the sentence that were not supported by the record when the district court directed the *Bostic* question towards the defense team, thus resulting in waiver of the sentence except for plain error review, a substantially heightened standard.

First, Movant argues that Mason was a potential witness in Edwards's case, and Edwards did not know that he was concurrently represented by Jack Lowery, Sr. Mason had set up a controlled purchase of cocaine from Benjamin Bernard Squire. Edwards contends that that cocaine was the cocaine used for the evidence to get the wire tap application in his case. Docket No. 30, p. 14. Edwards was one of the lead agents with regard to the controlled buy between Mason and Squire. *Id.* Once Edwards was charged criminally in federal court, he does not know what Mr. Mason's involvement in the case was. *Id.* Mr. Squire was also a defendant in the underlying criminal case against Edwards. *Id.* at 15.

Edwards testified that he believed that Jack Lowery, Jr. represented Mason at the same time he represented Edwards, because Lowery represented to a judge in Wilson County that he represented Mason at the same time he represented Edwards "in the same case." *Id.* Jack Lowery, Sr. testified that he did represent Mr. Mason on several "minor offenses," and at some

point he talked with Edwards about his potentially cooperating with the police. At the time, Edwards was a detective for Wilson County, who also was working for the federal government. Docket No. 31, p. 82-83. Edwards and another agent expressed an interest in having Mason cooperate with them in a drug investigation and stated that they would recommend charges against him be dismissed if he did that. *Id.* at 282. Those cases were later nolled. *Id.* Lowery, Sr. did not have any involvement in it anymore, except to follow up and see that the cases were dismissed. Lowery, Sr. confirmed that his conversation with Edwards about Mason was prior to Edwards's arrest in April 2011. *Id.* at 307. Jack Lowery, Jr. testified that he had never personally represented Mason. *Id.* at 320. He also testified that Mason had nothing to do with Edwards's obstruction charge in federal court.

While Edwards argues that there was a conflict of interest, the Court sees none because Mason had no role in the case against Edwards. Additionally, the representation of Mason by Lowery, Sr. did not affect Judge Haynes's reasoning when imposing Edwards's sentence. There is nothing in the record upon which the Court could conclude that Lowery, Sr.'s representation of Mason in any way prejudiced Edwards. Thus, Edwards cannot meet the second prong of *Strickland*, and this claim fails.

Second, Movant argues that Lannom failed to disclose his lack of experience in federal criminal cases before agreeing to take the case. Edwards argues that Lannom and his associates had "wholly deficient experience" in federal criminal practice. Docket No. 37, p. 30. He delegated the task of performing federal legal research to his associate, Melanie Bean, who was even less qualified. *Id.*

The record reflects, however, that Edwards chose to hire Lannom because he had seen

Lannom defend cases in state court proceedings and he thought Lannom "was a good attorney for the case." Docket No. 30, p. 81. He never inquired about Lannom's experience in federal court. *Id.* at 9-10. Lannom testified that Edwards told him he wanted Lannom to represent him because he knew Lannom was a "fighter" and knew Lannom would fight for him. *Id.* at 177. Lannom contradicted the claim that he did not advise Movant that he was not experienced in defending cases in federal court. *Id.* at 179. Lannom told Movant he needed someone to assist him on Movant's case because it was pending in federal court. *Id.* Lannom told Movant that he wanted to have Jack Lowery, Jr. work on the case and Movant agreed. *Id.* at 179-80. Given the foregoing, the Court concludes that Lannom told Defendant that he was not experienced in federal court and/or that he needed the assistance of Lowery, Jr. because Edwards's case was pending in federal court.

As the government also argues, even if the Court were to credit Movant's testimony on this issue, Movant has cited no authority for the proposition that a defense attorney has an obligation to tell a potential client that the attorney is not as experienced in federal defense work as the potential client might believe, or that the failure to make that disclosure is in and of itself ineffective assistance of counsel. Additionally, Edwards was represented by both Lowerys, each of whom is an experienced federal defense attorney. Again, Edwards cannot meet the second prong of *Strickland*.

Third, Edwards argues that there was absolutely "zero attempt" to hire a qualified and licensed investigator to investigate the facts or interview witnesses. This argument comprises all of three lines in Movant's Brief, and Movant does not discuss which "issues" he wished to have investigated. Movant further does not explain how any such investigation would have benefitted

him.

Lannom testified that, in his opinion, based upon the evidence, it was not necessary to

hire an investigator.  Docket No. 30, p. 196-97.  As the *Strickland* court stated:

> [S]trategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;
> and strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigations.  In other
> words, counsel has a duty to make reasonable investigations or to
> make a reasonable decision that makes particular investigations
> unnecessary.  In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all
> the circumstances, applying a heavy measure of deference to
> counsel's judgments.

466 U.S. at 690-91.

Moreover, Movant has not argued or shown how the results of any investigation might

have affected the course of Movant's criminal case.

Fourth, Edwards argues that the plea petition was not legally and factually accurate, and

that it somehow "presented the impression to all parties and to the court that the plea was

pursuant to a plea agreement with the government when, in fact, it was not."  Edwards's entire

argument on this point is as follows:

> The plea petition used to explain to Mr. Edwards what he was
> doing was so outdated that it was full of errors and gave the
> impression to Mr. Edwards that there was a plea "agreement" in
> place.  It was never actually given to Mr. Edwards beforehand, and
> even after the judge asked if his attorneys had reviewed it line-by-
> line and Mr. Edwards said yes at the direction of Mr. Lowery, this
> error was never corrected.

Docket No. 37, p. 20.  Movant never explains why the form "plea petition" was outdated.  But

even if it were, that fact is irrelevant, because as the government argues none of the parties or

Judge Haynes thought the plea was pursuant to a plea agreement. The "Transcript of Proceedings" concerning Movant's plea says nothing about a "plea agreement." Docket No. 418. Furthermore, the parties have submitted an Agreed Transcript of a conversation that occurred between Movant, Jack Lowery, Jr. and Jack Lowery, Sr. on February 3, 2012, the date he entered his guilty plea. Docket No. 33-1. According to that Transcript, Lowery, Jr. specifically told Edwards: "There is no plea agreement in your case. We've got the single petition, okay, this four page petition." Docket No. 33-1, p. 3.

As discussed above, the transcript of the pre-plea meeting shows that Edwards chose not to accept the government's plea offer for ten years, and that he full well knew he was entering an open plea, which meant he could be sentenced to twenty years.

Both Lannom and Lowery, Jr. testified that Edwards knew he did not have a plea agreement with the government when he pled guilty. Lannom specifically testified that Movant understood he was entering into an open plea. Docket No. 31, p. 204. Lowery, Jr. confirmed this testimony. *Id.* at 329, 358.

For the reasons discussed above, the Court simply does not credit Edwards's testimony on this point. The Court notes that Edwards does not allege that Judge Haynes committed any error or failed to comply with Rule 11, and the plea hearing transcript shows that he did not. The Court concludes that Edwards entered his plea knowingly and voluntarily, and he knew he was doing so without having any agreement with the United States as to his sentence. He plainly knew that he could receive a maximum sentence of twenty years.

Fifth, Edwards argues that his counsel failed to properly prepare for anticipated proof to be offered at the sentencing hearing and failed to move for a continuance. He also argues that

his counsel "did not discuss the calling of family members with their client and merely concluded that they would be unable to find former colleagues to testify on his behalf."

Edwards does not specifically explain which witnesses his counsel should have called at the sentencing hearing, what they would have said, or how their potential testimony would have helped his case.

Lannom explained why defense counsel did not call any witnesses on Edwards's behalf at the sentencing hearing. Docket No. 31, p. 210-12, 278-79. Lannom testified that Edwards's mother "just didn't desire to put herself in that situation . . . ." *Id.* at 211. Furthermore, Edwards's father had "very little sympathy if [Edwards], in fact, committed the crime, and he just wasn't going to make a good witness irregardless of how much he loved his son." *Id.* at 211-12. Additionally, his wife (or former wife) was accusing him of murder. *Id.* at 279. He had relationships through his career, but he was no longer in good standing with the people he had worked with for years, and he was indicted for acts while he was in that office. *Id.* at 279.

This claim is meritless, and Edwards has not met the second prong of *Strickland*.

Sixth, Edwards argues that his counsel negligently chose to argue about the quantity of drugs to be used for sentencing purposes, even though that quantity had no effect on the base offense level and opened the door for the government to introduce ancillary and prejudicial testimony. Edwards points out that he had already pled guilty to "more than five kilos of cocaine" and that the government had already said that they could prove far more than fifty kilos of cocaine had been part of the investigation.

The government responds that the facts upon which Judge Haynes primarily relied in his Statement of Reasons were already included in Edwards's Pre-Sentence Investigation Report

("PSR"), a copy of which had been provided to the Court at the start of the evidentiary hearing. The government further argues that even if Movant had not challenged the amount of cocaine, it would still have presented testimony "regarding the underlying investigation and how defendant's obstruction affected it as a basis for why the court should impose an above-Guidelines sentence." Furthermore, Movant does not discuss what alleged evidence was presented at the sentencing hearing as a result of the challenge to the cocaine that was not already in the PSR or would not have been presented regardless of that issue. Thus, Movant cannot prove that he was prejudiced by this factor. Movant fully supported the challenge to the amount of cocaine, and that was a strategic decision.

Seventh, Edwards complains that his counsel negligently advised him to completely forego allocution. As Lannom testified at the hearing, both Lannom and Lowery, Jr. were afraid to have Movant address the Court, for fear that Judge Haynes might find that he was not accepting responsibility for his crime. Docket Nos. 31, p. 213-14; 32, 385-87.

Movant has failed to establish what he would have told Judge Haynes and why his allocution would have resulted in a lower sentence. He has not shown either error or prejudice.

Eighth, Edwards argues that his counsel failed to object to the Court's upward variance or the factual basis for the sentence, thus resulting in waiver of the sentence except for plain error review. The government points to the fact that the Court of Appeals applied the lower abuse of discretion standard when it reviewed the reasonableness of the sentence itself. Docket No. 569. Thus, the Court of Appeals found that the length of the sentence was reasonable. Therefore, Edwards cannot prove that he was prejudiced by Lowery, Jr.'s failure to object.

**V. Conclusion**

For the foregoing reasons, the undersigned recommends that Movant's Motion to Vacate, Set Aside, or Correct Sentence (Docket No. 1) as amended (Docket No. 14) should be DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

  /s/ E. Clifton Knowles
E. CLIFTON KNOWLES
United States Magistrate Judge