IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN PATRICK EDWARDS, | ) | |
| Movant, | ) ) ) | |
| v. | ) ) | No. 3:14-cv-01256 |
| UNITED STATES OF AMERICA, | ) ) | Chief Judge Sharp |
| Respondent. | ) | |

# MEMORANDUM

This memorandum reflects the Court's analysis underlying its recent Order overruling Movant's objection to the Magistrate Judge's Report and Recommendation and denying Movant's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. (Docket No. 54.)

## I. STANDARD OF REVIEW

When a magistrate judge issues a report and recommendation regarding a dispositive matter, the district court must review *de novo* any portion of the report and recommendation to which a specific objection is made, and "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993). Federal courts have routinely deemed objections "waived" where the objections merely restate the party's arguments that were previously addressed by the magistrate judge. *See VanDiver v. Martin*, 304 F.Supp.2d 934, 937 (E.D. Mich. 2004) ("An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context."); *see also Charles v. Astrue*, No. 3:10–cv–134, 2011 WL 3206464 (E.D. Tenn. July 28, 2011).

## II. BACKGROUND

On February 3, 2012, Movant entered an open plea of guilty to one count of obstruction of justice, which was accepted by the Honorable William J. Haynes, Jr. Order Accepting Plea Petition, *USA v. John*

*Patrick Edwards*, No. 3:11-cr-00083 (M.D. Tenn. Feb. 3, 2012), ECF No. 258; Transcript of Proceedings-Plea, *id.*, (M.D. Tenn. Aug. 23, 2012), ECF No. 418 (hereinafter "Plea Tr."). The government's summary of the facts underlying the charge to which Movant pleaded guilty was as follows:

> If this case were to go to trial, the United States would prove the following facts.
>
> As alleged in Count Two of the indictment, beginning on or about April 4, 2011 through April 18, 2011, in the Middle District of Tennessee and elsewhere, John Edwards, aided and abetted by codefendant Rodney Mark Settles, did corruptly obstruct, influence, and impede an official proceeding and attempted to do so through the solicitation of money in exchange for information relating to the federal criminal investigation which resulted in the charge in Count One in the pending indictment of this case, in violation of Title 18, United States Code, Sections 1512(c)(2)(n)(2).
>
> Specifically, on April 6, 2011, the FBI received information that Edwards' codefendant in Count Two of the indictment, Rodney Mark Settles, who was not a law enforcement officer, had detailed information about an ongoing federal criminal narcotics investigation that involved federal wiretaps. Settles had indicated he had obtained this information from an associate of his who was in law enforcement. Further, Settles stated that something was about to happen that would bring the investigation to a conclusion, and that he and his associate were willing to provide information about the investigation so it could be passed on to the lead defendant in Count One of the indictment, codefendant Zeeshan Syed,[1] who was one of the targets of the federal investigation.
>
> Settles stated that they would help Syed get out of trouble in exchange for a couple hundred thousand dollars. The federal investigation to which he was referring to was being conducted by the Drug Enforcement Administration and the Federal Bureau of Investigation, and was an official proceeding as defined in Title 18, United States Code, Section 1512(f)(1) and 1515.
>
> The defendant had been a lieutenant with the Wilson County Sheriff's Department, and had been assigned to the Wilson County Drug Task Force, and had served as an FBI Task Force officer on that federal investigation.
>
> In March 2011, the defendant was removed from his position as a Task Force officer and suspended from the Wilson County Sheriff's Department following his arrest by the Tennessee Bureau of Investigation on an unrelated matter.
>
> Prior to being removed from his position, the defendant had worked on the federal narcotics investigation for several months. Through his work on that investigation, the defendant knew numerous crucial details of the investigation, including that it involved several federal wiretaps and the identities of several target subjects, including Zeeshan Syed and several of Syed's co-conspirators.
>
> The defendant knew that the conspiracy being investigated was a conspiracy to possess and distribute cocaine and marijuana in the Nashville area. Additionally, the defendant also knew the identity of a confidential informant involved in the investigation who had a close relationship with Syed and had been providing information about the conspiracy to the FBI since the summer of 2010.
>
> Based upon the information the FBI received about Settles on April 6, 2011, the FBI immediately began investigating Mr. Settles. For the next several days, the FBI was

---

[1] The plea hearing transcript and other documents in this case occasionally misspell Mr. Syed's name as "Sayd." The Court herein uses the accurate spelling as reflected in Case No. 3:11-cr-00083, in which Mr. Syed was a defendant.

able to obtain evidence against Settles which demonstrated that Settles and Settles' source of information, who was later determined to be the defendant, were attempting to obstruct the ongoing federal investigation.

On April 11, 2001, Settles was detained for questioning by FBI agents and Task Force officers and was transported to the FBI office in Nashville. At the FBI office, Settles agreed to be interviewed and provide information about the defendant's plan to sell information to a member of the narcotics conspiracy. Settles advised the FBI that the information he had about the investigation came from his friend and business partner, John Edwards.

According to Settles, on or about April 4, 2011, the defendant contacted Settles about an idea to help get him some money. The defendant knew Settles had a contact, Noo Zeeshan Syed, who was the subject of a federal narcotics investigation.

The defendant asked Settles to see if Syed would pay for information about the investigation. The defendant provided detailed information to Settles about the investigation that the defendant thought could help Syed. The defendant told Settles he wanted to trade that information about the federal investigation for $500,000.

The defendant had given the name of the informant to Settles -- excuse me, had given the name of an informant to Settles, and Settles had provided the name of that informant to Syed's contact. Settles also told the FBI that, while the defendant initially told Settles he wanted $500,000 for information about the federal narcotics investigation, Settles had only asked for $100,000 for that information.

When Settles later told the defendant that Syed was only willing to pay $100,000 instead of the $500,000 the defendant initially wanted for the information, the defendant responded that he also wanted a late model Range Rover in addition to the $100,000 payment.

Due to his involvement in the federal narcotics investigation, the defendant knew Syed was also in the business of selling used cars. Syed advised the agents that the defendant had directed Settles that the money from Syed was to be left in a safe at Bidmore Auction, an auction company that Settles and the defendant operated together.

On the following day, April 12, 2011, at the direction of and under the supervision of the FBI, Settles contacted the defendant via text message to arrange a meeting and advise the defendant that he had good news. At the direction of and under the supervision of the FBI, Settles then met with the defendant at Bidmore Auction for the purpose of conducting a consensually monitored conversation.

During their meeting, Settles motioned to Settles' pocket, indicating that he had money he had purportedly received as a partial payment for providing information about the investigation. The defendant mouthed that he was not going to talk aloud and gestured to Settles not to speak out loud, either. The defendant then typed a message to Settles, using a cell phone. The message stated that the defendant was not talking because Settles had been out late the night before and had not returned the defendant's phone calls. The defendant then typed out another message on his phone and directed Settles to give the money to a Bidmore employee to deposit. The defendant left shortly thereafter.

Settles gave $15,000 in cash, which the FBI had provided Settles, to the employee of Bidmore, and then left Bidmore. Settles later spoke to that employee and was told the defendant had taken that cash and arranged for it to be deposited into Bidmore's business accounts.

Almost a week later, on April 18, 2011, again, at the direction of and under supervision of the FBI, Settles met with the defendant for the purpose of a consensually recorded meeting at the defendant's residence. The defendant's residence was located

3

at 931 Bass Lane, Mt. Juliet, Tennessee, located in the Middle District of Tennessee.

When Settles arrived at the defendant's residence, Settles was directed by the defendant to meet in the corner of the tool shed on the defendant's property. The back of the tool shed had a door, outside of which there was a caged German Shepherd and a fire pit with a fire burning. The defendant then conducted a search of Settles to determine if Settles was wearing or carrying a recording device as a cooperating witness for law enforcement.

After searching Settles, a conversation then consisted of the defendant alternating between writing messages down on pieces of paper and speaking with Settles in a low voice or a whisper. After he wrote on pieces of paper, the defendant would then go out the back door by destroy the evidence and what had been written by putting the paper with the messages on it into the fire.

Prior to the conversation on April 18th, an FBI agent had provided false information about a supposedly new informant to the federal investigation to the defendant. Based upon that false information, during their conversation, the defendant advised Settles that there was a new informant in the federal investigation, that the defendant didn't know who it was. The defendant said he would try to find out the identity of the new informant.

The defendant then provided Settles with names of members of the drug conspiracy who the defendant did not believe were the new informant. Therefore, the defendant instructed Settles to tell them -- meaning Syed and his co-conspirators, to talk only to certain individuals and their group and to act normal.

Settles told the defendant that "they" were worried and were looking for the snitch the defendant had previously identified. The defendants then said it was "their" – meaning -- again, meaning Syed and his co-conspirators' -- own fault because they had acted out of character, and the federal investigators had hidden the new informant. Settles told the defendant he had seen the whole $100,000 payment. Settles then said that "they," meaning the defendant themselves, needed the money. The defendant agreed and said they had expenses.

Referring to their business of running Bidmore Auction, Settles said that if they did not get the money, they were done. The defendant agreed and said he understood. The defendant then instructed Settles to go and get the money that day. The defendant had previously given the names of two -- excuse me, had previously given the names of the two lead federal agents on the federal investigation to Settles, but initially told Settles not to pass this information on to Syed.

Near the conclusion of their meeting on April 18, 2011, Settles asked the defendant if Settles should now provide the name of the agent in charge of the investigation. The defendant said, I don't care.

As stated earlier, during his debriefing, Settles had previously told FBI agents that, in addition to the $100,000 payment, the defendant also wanted a vehicle as compensation for the information he was providing about the investigation. At the conclusion of their meeting, Settles said that he was going to go downtown in order to get the remaining money. And the defendant reminded him, I want my truck. Settles asked if the defendant meant a Land Rover, and the defendant said no, the Range Rover.

Plea Tr., ECF No. 418, at 20–27.

The Court held a sentencing hearing on April 27, 2012, during which it determined that Movant's sentencing guidelines range was 108–135 months in prison, based on a total offense level of thirty-one

4

and a criminal history category I. Transcript of Proceedings-Sentencing, *id.*, (M.D. Tenn. Aug. 23, 2012), ECF No. 419, at 75 (hereinafter "Sentencing Tr."). After hearing additional evidence related to sentencing factors pursuant to 18 U.S.C. § 3553, the Court varied upward from the advisory guidelines range and sentenced Movant to 220 months in prison – 4 months more than the government requested. Sentencing Tr., ECF No. 419, at 130, 134; Judgment, *id.*, (M.D. Tenn. May 2, 2012), ECF No. 322. The Court described "three major concerns" supporting the lengthy sentence: (1) the defendant's "serious and material compromise" of the wiretap process that is "highly confidential . . . and is treated so by the court and the agencies involved"; (2) the fact that the case involved a "major drug investigation," a multi-million dollar enterprise with Mexican sources, warehouses in Atlanta and more than 200 kilos of cocaine transported into this district; and (3) "personal safety issues" arising from the violence associated with Mexican drug cartels, the knowledge that individuals involved in the cases carried weapons, and the solicitation of a murder contract by one of the principal targets of the investigation. Sentencing Tr., ECF No. 419, at 131–32. The Court also observed that Movant's history as a law enforcement officer indicated his awareness of the potential harm from his disclosure, and that the amount he demanded in return for the disclosures reflected how significant he believed the information to be. *Id.* at 132. The Court conveyed that the gravity of the risk in this case was underscored by evidence that the confidential informant whose identity Movant attempted to sell had to be moved within 24 hours of the disclosure, and that his location was still discovered by members of the criminal operation. *Id.* at 133.

The remainder of the relevant case history and applicable standards are accurately set forth in the Report & Recommendation. The Magistrate Judge held an evidentiary hearing on Movant's claims spanning three days. (Docket Nos. 30–32.)

### III.  MOVANT'S OBJECTIONS

The bulk of Movant's brief in support of his objection (Docket No. 50) consists of repetition of the factual assertions and arguments he advanced in his previous filings and does not constitute proper objection to the Report & Recommendation. Accordingly, the Court only addresses his seven expressly enumerated alleged errors in the Magistrate Judge's factual findings.

A. Mexican Cartel

Movant asserts that the Magistrate Judge's finding that Movant "knew at the time that some of the conspirators included members of a Mexican drug cartel" has no basis in the record. (Docket No. 50, at 23 (quoting Docket No. 44, at 2)().) Movant's assertion is simply false. The lead FBI agent on the underlying investigation testified at Movant's sentencing hearing that two of the drug suppliers under investigation were affiliated with the Gulf Cartel, a Mexican drug cartel, and that Movant was aware of that fact. Sentencing Tr., ECF No. 419, at 10, 18–19. This objection is without merit.

B. Counsel's Understanding of "C Plea"

Movant complains that the Magistrate Judge wrongly concluded that counsel effectively advised Movant to accept a 10-year plea agreement, because counsel did not adequately understand what it meant to plead guilty pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). (Docket No. 50, at 24.) Movant elicited evidence at the evidentiary hearing to suggest that one of the three attorneys counseling Movant about the government's offer lacked a high degree of familiarity with federal sentencing issues (which is why he associated another attorney who had a great deal more experience in federal criminal defense), and that there were a few errors in a worksheet prepared by another of his attorneys regarding the potential application of certain federal sentencing guidelines to Movant's case. However, regardless of the terminology they used or the specific legal provisions they may have miss-cited, the testimony of all three attorneys at the evidentiary hearing fully established that they understood and effectively explained to Movant the key facts about the offer: that it was for a definite agreed sentence of 10 years and that he risked a significantly higher sentence if he rejected it, either by going to trial or entering an open plea.

Moreover, the errors and alleged misunderstandings about federal sentencing procedures did not affect the outcome of Movant's case. Movant testified that he had never even seen the sentencing guideline worksheet that contained the errors. (Docket No. 32, at 71.) Furthermore, the worksheet errors in question overstated the base offense level and resulting guidelines range for then-anticipated superseding drug charges against Movant (Docket No. 32, at 50), so the only logical impact of the error would have been to make Movant ***more likely*** to take the 10-year deal, which he now maintains he would have done, but for the ineffectiveness of counsel. (See, e.g., Docket No. 30, at 63–64.) Similarly,

Movant's attempt to show that one of his attorneys was unclear about the procedure following a judge's refusal to accept a C plea failed to demonstrate any impact on his case when (a) the evidence indicates that the issue of potential rejection of the plea agreement was not a factor in Movant's decision to refuse the deal, (b) the agreement itself expressly provided that either party could withdraw in the event that the judge rejected the agreed sentence (Docket No. 31, at 76–77), and (c) the hypothetical scenario raised at the evidentiary hearing – that the Court would accept Movant's 10-year plea agreement pursuant to Rule 11(c)(1)(C) but then impose a sentence of greater or less than 10 years (Docket No. 31, at 47) – is a legal impossibility under the Rule. *See* Fed. R. Crim. P. 11(c)(3), (4) and (5). Accordingly, Movant has failed to demonstrate either that counsel's advice about the proposed plea agreement was deficient or that any alleged deficiencies had any prejudicial effect on his case. This objection is without merit.

### C. Movant's Credibility

Movant disputes the Magistrate Judge's finding that his testimony was "significantly impeached" and lacked credibility. (Docket No. 50, at 25.) Specifically, he argues that the Magistrate Judge "erroneously" concluded that Movant's testimony that he believed he was entering a plea agreement with a guaranteed sentence of no more than 90 months was impeached by the recording of the pre-plea meeting with his attorneys, during which he "was advised no fewer than three times that the maximum term to which he could be sentenced was twenty years." (*Id.* (quoting Docket No. 44, at 5).) To the contrary, the Magistrate Judge's assessment appears to have been completely accurate and is overwhelmingly supported by the record.

Shortly before his plea hearing, Movant met with two of his attorneys – Jack Lowery, Jr. and Sr. – who recorded most of the meeting. During the meeting, the attorneys advised Movant about the type of plea he was considering: "it's an open plea, . . . there's not even an attached plea agreement" (Docket No. 33-1, at 3); "There is no plea agreement in your case. We've got the single petition, ok, this four-page petition. And there is no plea agreement . . ." (*id.*); "in an open plea, it's just that, it's open there are no agreements. And it's ultimately up to the judge." (*Id.* at 27.) They further advised him that the government had put them "on notice that they were going to try to enhance [Movant's sentence] any way they . . . could," and the "sentence could carry up to 20 years" (Docket No. 33-1, at 1); "the cap in this statute that

7

he's pleading to is 20 years. And [the government is] going to try to get him there." (*Id.* at 5.) Counsel "guarantee[d]" that the Court would apply offense level increases for Movant's leadership role and abuse of position of trust, and explained that if the government proved the amount of drugs in the underlying conspiracy was 50 kilos, his final offense level would be 31 with a resulting guidelines range of 108–135 months. (*Id.* at 8–9.) If the government only proved 5 kilos, his level would be 27 with a resulting range of 70–87 months.[2] (*Id.* at 9.) However, counsel unambiguously advised him that "the Judge can depart from the guidelines and . . . [h]e can go upward. He's not bound by these goddamn guidelines." (*Id.* at 6.) They repeatedly explained that the government was likely to try to prove that Movant had put law enforcement agents' lives in jeopardy and didn't "care about life," that the case called for an increased sentence as deterrence (*id.* at 6, 11, 12), and that the Court could increase his sentence beyond the guidelines range on those bases pursuant to § 3553. (*Id.* at 5, 10, 11.) Counsel cautioned him that by entering an open plea, he was "gambling" and taking a "risk," and that if the Judge accepted the government's § 3553 arguments, "you're looking at something that could shoot up on you." (*Id.* at 5, 6.) Neither attorney at the meeting recommended the open plea, and one of them unequivocally advised against it and argued in favor of accepting the 10-year plea agreement instead: "I don't think you ought to take today, I'll say it bluntly. I don't think you ought to plea open on this damn case. I think, the ten year offer is a hell of a better – better deal." (*Id.* at 5.)

It is clear from the record of that meeting that Movant rejected his attorneys' advice, not because he had any confusion about the choices he faced, but because he believed, based on what he had heard about sentences imposed in cases he considered to be more serious than his, that the Court would sentence him to less than ten years with an open plea. (*Id.* at 7–8, 11, 30.) Specifically, he speculated

---

[2] The base offense level for obstruction of a criminal investigation is the **higher** of (1) the level determined under U.S.S.G. § 2J1.2, **or** (2) six levels lower than the level that would apply under § 2X3.1 for being an accessory after the fact to the underlying crime. § 2J1.2(c)(1). This provision of the guidelines has been referred to by the parties in this case as "the cross-reference." Because the underlying crime in Movant's case was a drug conspiracy, the amount of drugs involved in the conspiracy was relevant to his base offense level under 2X3.1. Pursuant to § 2D1.1, the base offense level for 50 kilograms is 36, resulting in a level of 30 under 2X3.1, whereas the base offense level for only 5 kilograms is 32, resulting in a 2X3.1 level of 26. (Docket No. 31, at 132–33.) The investigation that Movant was charged with obstructing was the long-term investigation into the drug conspiracy involving members of the Mexican drug cartel. His continued insistence that drug quantity did not affect his offense level, based on the government's acknowledgment that the wholly separate amount of drugs Movant personally conspired to sell would not affect his guidelines range, is specious. (See Docket No. 50, at 18.)

that his sentence would be seven years. (*Id.* at 8.) But Movant clearly knew that this expectation was based on his own conjecture rather than any guarantee under the law or agreement with the government: "I ***think*** it will fall below 10 years. I mean ***I don't know***." (*Id.* at 8 (emphasis added).) Near the end of the meeting, Lowery, Jr. reiterated to Movant that "[t]here is no plea agreement here" and "basically we go in there and pleading, and you're going to get anywhere from 0 to 20 years," and Movant responded "I know, I know," and acknowledged that "[t]he judge can do whatever they want to do." (*Id.* at 29.) Movant said to counsel "I'm sorry dude," presumably for choosing to proceed with the open plea against counsel's advice, and went on to say "I may be wrong . . . I may be wrong and I know they're gonna fight to do whatever they can to me, but . . . I mean I just don't see" how he could receive a harsher sentence than the Court had imposed in another case about which he had heard. (*Id.* at 29–30.)

Movant tried to establish that he was confused about the nature of his plea by testifying that after Lowery advised him not to take the open plea, his other attorney, Frank Lannom, advised him to take it and said that he was "in the best possible position." (Docket No. 30, at 19.) Specifically, he testified that Lowery advised him that the drug quantity involved in the underlying conspiracy could affect his sentence pursuant to U.S.S.G. § 2X3.1, but then Lannom told him that the 2X3.1 cross-reference making drug quantity relevant did not apply to his case, that 90 months was the maximum sentence he would receive, and that his likely sentence would be even lower than that. (Docket No. 30, at 19–21.) But that account of the allegedly conflicting advice contradicts Movant's testimony immediately before and after it, when he testified that Lowery had advised that the drug quantity was irrelevant, and that it was Lannom who said that it was "the most important thing in the case" and would determine what sentence he received. (*Id.* at 17–18, 21–22.) It also contradicts Movant's original allegation that Lowery is the one who "entice[d him] into taking a plea" by advising him that the drug quantity would not affect his sentence. (Docket No. 1, at 14; Docket No. 30, at 17–18.) And Lannom himself testified that he had determined "way before" the date of Movant's plea that § 2X3.1 applied to his case and made the drug quantity relevant. (Docket No. 30, at 188–89.) Moreover, it is clear from Movant's statements during the recorded conversation with the Loweries that he had already made up his mind to take an open plea, despite accurate advice from counsel about the factors affecting his guidelines range (including drug quantity, leadership role and

9

abuse of position of trust) and the possibility that the Court would impose an above-guidelines sentence. Movant cannot credibly assert that any allegedly deficient advice he might have received from Lannom after that meeting was a deciding factor in his choice to enter the open plea.

Accordingly, the Magistrate Judge properly found that Movant's testimony that he believed at the time of his plea that "they couldn't go over 90 something months and that that's what the plea was for" (Docket No. 30, at 24), and that he did not understand what it meant to take an open plea (*id.* at 19), was "simply unbelievable."[3] (Docket No. 44, at 7.) Even on paper, that obvious falsehood calls into question the credibility of Movant's entire account of the relevant events, and the Magistrate Judge had the additional advantage of being able to observe the demeanor of the Movant and the other witnesses as they gave their conflicting testimony. Movant's objection regarding his credibility and the extent to which he was impeached at the hearing is without merit.

D. "Of His Own Free Will"

Movant objects to the Magistrate Judge's observation that Movant told his attorneys at the pre-plea meeting "that he wanted to enter an open plea, and that he was doing it of his own free will." (Docket No. 44, at 7 (quoted in Docket No. 50, at 25).) Movant cites his own evidentiary hearing testimony to the effect that he would not have used the "of my own free will" language unless his attorneys had told him, during a portion of the conversation that was not recorded, to use those words. (Docket No. 50, at 25–26.)

This objection is inconsequential, because Movant's denial that the phraseology was his does not equate to a denial that the decision to enter the plea was his. As discussed above in subsection C, the recording of the meeting leaves no room for doubt that Movant made his own decision, against his attorneys' advice, to take an open plea. That fact is even clearer from the audio recording than it is from the transcript, because the audio more effectively conveys how assertive Movant was in the conversation, and his willingness to interrupt or challenge his attorneys any time he disagreed or did not understand

---

[3] The Court limits its analysis to the single example of impeachment raised in Movant's objection (Docket No. 50, at 25), but notes that the same evidence also belies Movant's testimony that he was not informed until the day of his sentencing hearing that the government intended to seek an above-guidelines sentence. (Docket No. 30, at 50–51, 144–45.)

what they were saying.  He testified that the decision was "based upon the information I had at the time," which he claims "was wrong" (Docket No. 30, at 106), but – again, as discussed above – that information included the fact that the government intended to seek a sentence as close to the 20-year maximum as possible, and that there were factual and legal bases to do so.  This objection is without merit.

### E.  Advice Regarding Right to Allocute

It is unclear whether Movant is objecting to the Magistrate Judge's finding that he was aware of his right to address the Court at sentencing, or to the suggestion that Movant's testimony on that point at the evidentiary hearing was inconsistent.  The record clearly supports both findings.  On direct examination, when asked if his attorneys had "talk[ed] about your right to address the court prior to having a sentence imposed," Movant responded "No, I didn't know anything about being able to do that." (Docket No. 30, at 53.)  But on cross-examination, he acknowledged that days before the hearing, he and his attorneys had discussed whether he would "give a statement at [the] sentencing hearing," which he now knows is called an allocution, and that they advised him not to do so – "absolutely no." (*Id.* at 76.)  Still later, he again denied that his attorneys ever told him that he could "stand up in front of the judge and speak on [his] own behalf." (*Id.* at 158.)

Movant's admission that his attorneys did discuss with him the possibility of giving a statement at his sentencing hearing is corroborated by Lowery, Jr.'s testimony (Docket No. 32, at 20), and the Court concludes it is the more credible version of the facts.  That Movant may not have known the legal term "allocution" at the time of that discussion has no bearing on whether he understood the substance of his right or was effectively advised about whether to exercise it.  To the extent his objection can be construed to raise the merits of his claim that his attorneys were ineffective in preventing him from allocuting, the Magistrate Judge properly found that counsel had a strategic reason for not wanting Movant to allocute,[4] and that Movant has failed to demonstrate prejudice by not establishing what he would have said or how

---

[4] That strategic decision, based on concern that Movant would fail to accept responsibility and lose his 3-level reduction, was understandable in light of Movant's attempt to shift blame to his co-conspirator, his wife and others during the pre-plea meeting (Docket No. 33-1, at 13–14), and proved correct at the evidentiary hearing in this case when Movant hedged on his responsibility and claimed that the witnesses who testified against him at the sentencing hearing lied about relevant facts. (Docket No. 30, at 46, 59–61, 76–80.)

it would have affected the outcome of his case.

F. Movant's Understanding of His Plea

Movant argues that the Magistrate Judge erroneously failed to conclude that on the day he entered his open plea, Movant believed that he had a plea agreement. (Docket No. 50, at 27.) He accurately observes that the plea petition form erroneously references a plea agreement and states that the plea is a result of negotiations between counsel and the government. But Movant's understanding of what was happening was clearly not affected by the language of the petition, which he claims he never read. (Docket No. 30, at 23.) Moreover, as discussed above in subsection C, Movant's recorded conversation with counsel before his plea hearing firmly establishes that he understood the nature of his open plea and the risk he was taking by entering it. This objection is without merit.

G. Counsel's Alleged Admission of Mistake

Movant objects to the Magistrate Judge's finding that Movant's claim that Lannom later acknowledged and apologized for giving him bad advice lacked credibility. (Docket No. 50, at 28.) Although Movant's objection does not provide a citation, that claim first appears in the record in his rebuttal testimony near the conclusion of the evidentiary hearing, and specifically relates to the issue (briefly addressed in subsection C above) of the application of the sentencing guidelines' "cross-reference" to guidelines for the underlying conspiracy. (Docket No. 32, at 77.) Much like the "free will" objection, this objection is inconsequential because an attorney's apology for an error, even if it happened, would not suffice to establish ineffective assistance. Moreover, upon review of the record, the Court expressly adopts the Magistrate Judge's finding that the claim that Movant could have received such an acknowledgment and apology, but failed to raise it in either his original or amended § 2255 motion, his pre-hearing briefs or his initial hearing testimony, is unworthy of any belief. And, as mentioned above, such a claim is contradicted by Movant's own testimony that prior to his plea, Lannom told him that drug quantity was important to the case and would affect his sentence. (Docket No. 30, at 18.) This objection is without merit.

## IV.  ADDITIONAL SUPPORT FOR THE MAGISTRATE JUDGE'S CONCLUSIONS

As a general matter, all of Movant's claims that counsel were ineffective for failing to investigate or present witnesses, evidence or citations would fail, regardless of any alleged deficiencies in counsel's work, because he failed in this case to furnish any of the allegedly missing evidence or information as required to demonstrate prejudice.  *See Hodge v. Haeberlin*, 579 F.3d 627, 640 (6th Cir. 2009) (petitioner fails to prove prejudice where he "gives no details about the substance" of evidence he alleges was ineffectively omitted and simply speculates that such evidence would have affected the case).

Moreover, the record reflects only one instance of actual deficiency in counsel's performance, and that is the failure to object to the sentence imposed at the conclusion of the hearing.  The Magistrate Judge correctly found that, with regard to Movant's appeal of the substantive reasonableness of his sentence, that failure to object did not prejudice him, because the Court of Appeals still applied an abuse-of-discretion standard to his claim.  The Court would add that the Court of Appeals's ruling establishes that no prejudice arose from the failure to object with regard to Movant's procedural claims on appeal either.  Although the court stated that those claims were reviewed for plain error because of the lack of objection, it went on to find that this Court's rulings were "explicit" and its justification for the upward variance was "adequately explained . . . based on the nature and sophistication of the drug conspiracy, the fact that Edwards violated the highly confidential process related to wiretaps, and the fact that Edwards knowingly put numerous individuals in serious danger for monetary gain." Information Copy of 6CCA Order/Opinion, *USA v. John Patrick Edwards*, No. 3:11-cr-00083 (M.D. Tenn. April 30, 2013), ECF No. 569.  Given those findings, there is no reasonable probability that the outcome of either Movant's sentencing hearing or appeal would have been different even if counsel had objected.

## V. CONCLUSION

For the reasons explained above and in the R&R, as well as those already mentioned in the Court's final Order, the Magistrate Judge correctly concluded that Movant did not establish that he was entitled to relief under § 2255. The motion was accordingly denied.

_____
Kevin H. Sharp, Chief Judge
United States District Court